# WIGGINS *v*. STATE.

No. 39738          May 16, 1955          80 So. 2d 17

*John D. Gautier,* Pascagoula, for appellant.

*Joe T. Patterson,* Asst. Atty. Gen., Jackson, for appellee.

HALL, J.

At the May 1954 term of the Circuit Court of Jackson County appellant was indicted for murder. His case was continued at the May term and came on for trial during the second week of the November 1954 term at which time appellant filed a motion to quash the jury panel for the reason that the names of the jurors in the compartment of the jury box representing the fifth supervisor's district had been exhausted. The motion was overruled and a jury was selected from the first, second, third, and fourth supervisors' districts. No special venire was requested and the jury which tried this case was selected from the regular panel.

On the motion to quash it was shown by the circuit clerk that when the jury box was filled by the board of supervisors under the statute the names of all qualified electors from District No. 5, who were qualified for jury service, were placed in the box, but there were only a limited number of persons qualified for jury service in District No. 5 and because of the unusual number of special venires at the May 1954 term the compartment for District No. 5 was drawn down to the point that there were only seven names from that district for this November term, and all of these were drawn during the first week of that term.

We do not think that the lower court erred in overruling the motion to quash the jury panel, which is the first error assigned. Section 1798, Code of

1942, provides that the provisions of law in relation to the listing, drawing, summoning, and impanelling of juries are directory merely and are not mandatory. We held in Lott v. State, 204 Miss. 610, 37 So. 2d 782, and in Kouvarakis v. Hawver, 208 Miss. 697, 45 So. 2d 278, that a case will not be reversed unless there is a radical departure from the statutory scheme of summoning and impanelling juries.

Appellant contends secondly that he was entitled to a peremptory instruction and, as in so many cases coming to this Court, he contends that under the doctrine of Weathersby v. State, 165 Miss. 207, 147 So. 481, we must accept his version of the killing since there is no eyewitness. The rule in Weathersby and similar cases is that the defendant's version, if reasonable, must be accepted as true unless substantially contradicted in material particulars either by a credible witness or witnesses or by physical facts or by facts of common knowledge. In this case the appellant's version of the killing was that it was an accident. This was contradicted in many particulars, and to demonstrate this it is necessary that we review the evidence.

Appellant is 59 years of age. He formerly lived in Long Island, New York. Several months before the killing he brought his stepdaughter, Mrs. Ruth Mack, to Pascagoula, Mississippi. She was 36 years of age. They set up housekeeping and passed off in the community as husband and wife. A few weeks before the killing she left the appellant and moved across town and started living with a man by the name of Thomas. They were boarding in the home of a private family. Appellant was very much interested in getting Mrs. Mack to come back and live with him and he visited her several times at her boarding place. On the day in question Mrs. Mack went with appellant to his home and they spent most of the day together. Late in the afternoon he carried her back to her boarding place and left her. He then went

to the home of another step-daughter and obtained a .22-caliber, single shot, bolt action rifle and came back to Mrs. Mack's boarding place, which was the home of a Mrs. Green. Mrs. Green came to the door and according to her testimony he demanded to see Mrs. Mack and pointed the gun at Mrs. Green in a threatening manner and she told him to get out of the yard and shut the door on him. She testified that at that time he looked like a wild man. She notified Mrs. Mack that the appellant was outside and wanted to see her but also warned her that he had a gun with him. Mrs. Mack stated that she was not afraid of appellant or his gun and went out the front door and shut the door behind her. Mrs. Green and the man Thomas were sitting in the living room and they both heard two shots fired. One of these shots apparently went wild and the other struck Mrs. Mack in the neck and severed her spinal cord. She fell completely paralyzed and was carried to a hospital and died about four hours later. Before Mrs. Green or Thomas came out of the house after the shots were fired appellant got in his automobile and drove away. He carried the rifle back to the home of his other step-daughter and hid it in the closet. Mrs. Green ran to the home of a neighbor and telephoned the police and the alarm was put on the police radio and immediately heard by a patrolman, who went to the home of the appellant's step-daughter where he had gotten the rifle and found him there. Appellant tried to escape out of the back door but another officer ran around to the back and they apprehended appellant at that point. These officers questioned the appellant at that time and he first denied that his name was Wiggins, stating that it was Sanford. They asked him for some identification and finally he handed them his wallet and they saw his name in it and appellant then stated, "Well, I am the man you are looking for, I shot her and I am glad." He also said, "If I can't have her, nobody else will." He then led the of-

ficers back inside the house and got the rifle from the closet and gave it to them. We think that under the facts detailed the jury was amply justified in finding that the appellant was guilty of a brutal and cold-blooded murder and that the circuit judge committed no error in submitting the case to the jury. Appellant's version was disputed in material particulars. He said that only one shot was fired and that it was accidental. Mrs. Green and Thomas testified positively that two shots were fired. If two shots were fired, it could not have been by accident, since, as we have heretofore stated, the weapon was a single shot, bolt action, rifle. It was necessary to break the breech, eject the expended shell and reload the rifle before a second shot could have been fired. Appllant denied the testimony of the officers as to the statements which they say he made, and his version was disputed in those particulars. These conflicts in the evidence, as well as some other inferential conflicts, take this case out of the Weathersby rule and present a jury issue.

It is contended lastly that the trial court erred in admitting in evidence a letter which was found in the coat of deceased after her death. It is addressed to the police but is too lengthy to set out in full herein. Its general tenor is that Ruth once loved him but left him for another man; that he has tried to persuade her to come back to him but has been unsuccessful in doing so; that he has just killed the other man and that appellant's body will be found in the fire at his own home, thereby cheating the law out of a hanging for his act. In lengthy terms he professed his undying love for Ruth and called her name six times in the letter. It says that he has laid his plans well and there will be no slip-ups, and that he wants his act to be a lesson to other cheating women. The letter is unsigned, but Mrs. Jones, a sister of Ruth, testified that she is familiar with appellant's handwriting and is of the opinion that the letter was

written by him. He denied writing it and testified that he did not know that Ruth was living with another man. We think the letter was sufficiently identified by Mrs. Jones for submission to the jury for whatever it was worth, and that it was competent as showing a motive for the killing and also in contradicting appellant's testimony that he did not know that Ruth had taken up with another man. A witness, who in the course of official business or in any other way has acquired by experience a knowledge of a person's handwriting, may state his opinion as to whether a particular writing was made by such person. 32 C. J. S. page 212, Evidence, Section 516 b (4).

The judgment of the lower court is affirmed and the date of appellant's execution is set for Monday, June 20, 1955.

All the justices concur except *Roberds, J.*, who took no part.